## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

_____
                                        )
Seaon Environmental, LLC,               )
                                        )
                    Plaintiff,          )
                                        )
             v.                         )    Case Number _____ 20-1207 C
                                        )    Judge
                                        )
THE UNITED STATES OF AMERICA,           )
by and through the Department of the Navy, )
Naval Supply Systems Command            )
                    Defendant.          )
_____       )

## PROCUREMENT BID PROTEST COMPLAINT ("COMPLAINT")

## I.    INTRODUCTION

This is a post-award procurement bid protest. The Department of the Navy, Naval Supply Systems Command ("the Navy", "Government" or "Agency") unreasonably and arbitrarily awarded the contract under Solicitation number N6824620Q0037 for the treatment and recycling of oily wastewater ("OWW") to Kanto Kosan, ("Kanto" or "Awardee").

## II.    NATURE OF THE ACTION

1.    Seaon Environmental, LLC, ("Seaon," or "Protestor") contends that the protested contract award is flawed and irrational. The contracting officer ("CO") failed to investigate, determine, and document whether Kanto has a satisfactory record of integrity and business ethics. The CO acknowledged she was aware of media reports that Kanto was under investigation by the Navy for fraud and falsification of lab testing but did not make any inquiries regarding the same. This investigation, and any information regarding the same, by its nature,

has a strong bearing on whether the awardee should be found responsible.

2.      Furthermore, because all offerors have an implied obligation of disclosure—imposed by the general principles of integrity and business ethics required by the Federal Acquisition Regulations ("FAR")—and the Awardee in this case failed to certify and report a serious matter that was relevant to the award of this contract, their proposal was tainted with a material misrepresentation and a false certification to the Government. FAR § 9.104-1 (requiring that prospective contractors be responsible, which includes a finding that they have a satisfactory record of integrity and business ethics); FAR § 9.406-2 (listing the causes for debarment, including "any other cause of so serious or compelling a nature that it affects the present responsibility of the contractor").  The CO's failure to consider this material misrepresentation, serious facts material to Kanto's business ethics, along with her failure to follow the Solicitation requirements and procurement law rendered the award arbitrary, capricious, and an abuse of discretion.

3.      Additionally, given the unique scale of potential harms and magnitude of risks due to the award to Kanto (involving serious safety, health, environmental, and political risks), which would be paid for by taxpayer dollars, the CO conducted a flawed past performance evaluation and the award is arbitrary, capricious, and irrational. This award also constitutes a violation of the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253.

### III.   JURISDICTION

4.      This Court has jurisdiction over this post-award bid protest pursuant to 28 U.S.C. § 1491(b)(1). According to statute, the Court of Federal Claims shall have jurisdiction to render judgment on any action submitted by an interested party objecting to a proposed award or the award of contract, or any alleged violation of statute or regulation in connection with a

procurement or a proposed procurement. This statute also gives the Court of Federal Claims the power to entertain such an action without regard to whether suit is instituted before or after the contract is awarded. *See* Am. Fed'n of Gov't Employees, AFL-CIO v. United States, 258 F.3d 1294, 1300 (Fed. Cir. 2001) (explaining that section 1491(b)(1) was enacted as part of the Administrative Disputes Resolution Act ('ADRA') of 1996); RAMCOR Servs. Group, Inc. v. United States, 185 F.3d 1286, 1289 (Fed. Cir. 1999) (explaining that the ADRA covers primarily pre- and post-award bid protests)

### IV.    INTERESTED PARTY AND STANDING

5.    The pivotal element of standing in this Complaint is whether Seaon qualifies as an "interested party" pursuant to §1491(b)(1). Am. Fed'n of Gov't Employees, AFL-CIO, 258 F.3d at 1302. The Federal Circuit Courts have construed the term "interested party" consistent with its definition in the Competition in Contracting Act, 31 U.S.C. § 3551(2)(a). Am. Fed'n of Gov't Emps., 258 F.3d at 1302; Avtel Servs. Inc. v. United States, 501 F.3d 1259, 1261 (Fed. Cir. 2007).

6.    To have standing as an "interested party," Seaon must satisfy a two-part test. First, it must demonstrate that it is an actual or prospective bidder. Rex Serv. Corp. v. United States, 448 F.3d. 1305, 1307 (2006) (plaintiff must establish that is it an actual or prospective bidder and that it possesses the requisite direct economic interest). Second, Seaon must demonstrate that it has a direct economic interest in the procurement. Rex Serv. Corp., 448 F.3d. at 1307; see also Distributed Solutions, Inc. v. United States, 539 F.3d 1340, 1344 (Fed. Cir. 2008). Each protester must show that it is an actual or prospective bidder and processes the requisite direct economic interest. Rex Serv. Corp., 448 F.3d. at 1307-08.

7.    Here, Seaon is an actual bidder because it met the Solicitation and bid

3

requirements and reached the final stages of agency consideration for award. Seaon is the

incumbent contractor and was the other bidder for this Solicitation. The notification from the

contracting officer provided no reason as to why Seaon was not given the award, but merely

stated that "[t]he award decision was based on lowest price, technically acceptable." Exhibit

A. Based on this, Seaon has standing to pursue this bid protest.

8.      Due to the agency's unreasonable evaluation considerations, Seaon was

prejudiced by this award determination. The Agency's judgment was unreasonable and not in

accordance with the Solicitation's contemplated evaluation criteria and applicable procurement

law. But for the Navy's unreasonable actions, and its failure to consider concealment and material

misrepresentations by Kanto, Seaon would have been awarded the contract. Furthermore, should

the Court grant the relief that Seaon seeks, Seaon would continue to respond to any Agency

requests and would be ready, willing, and able to perform the contract requirements.

9.      Seaon will suffer irreparable harm if the Agency's arbitrary and capricious

evaluation is allowed to stand. Seaon's irreparable harm includes, but is not limited to, loss of

revenue derived from the contract as well as future competitiveness. If this award is allowed to

stand, Seaon may have to remove its operations from Sasebo, Japan, thereby further reducing its

ability to compete for any future contracts in the area, and significantly increasing the costs to

the Government (as there will be no other immediate capable contractors in the area) if Kanto's

award is later cancelled or the government must otherwise terminate Kanto's contract. Seaon is

prejudiced by the Agency's actions because it has been deprived of a fair and competitive bid

evaluation while being excluded due to Kanto's concealment and the CO's failure to even

consider appropriate regulations to see if there was an impact on Kanto's record of business

ethics. For these reasons, Seaon has standing to bring this bid protest.

10.     Furthermore, an unsuccessful offeror may make a claim against the Agency pursuant to the Administrative Procedure Act, 5 U.S.C § 702, which states, in part: 'a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof.'

## V.    PARTIES

11.     Plaintiff, Seaon Environmental, LLC, is a leading provider of value-focused environmental services and logistics for the maritime industry. Their administrative offices are located at 2055 E Warner Road, Tempe, AZ 85284.

12.     Defendant is the United States of America, acting by and through the Department of the Navy. 10 U.S.C. § 101.

## VI.    FACTUAL ALLEGATIONS

13.     On August 7th, 2020, RFQ N6824620Q0037, a Firm Fixed Price solicitation for OWW treatment and recycling commercial services was released as a full and open competition. Solicitation, pgs. 1, 3. In this Solicitation, NAVSUP seeks offerors for "Oily Wastewater (OWW) treatment and recycling services for energy recovery purposes. The contractor shall provide all services necessary for the final treatment/disposal of the hazardous and/or non-regulated materials in accordance with all applicable **Federal, National, Provincial and Local to Japanese, Prefecture or City Regulations**, References, Attachments and PWS stated herein." *Id*., pg. 3 (emphasis added). The Solicitation lists ten different Japanese and Navy environmental laws and regulations incorporated by reference. *Id*.

14.     OWW in the statement of work in the instant contract refers to the waste

water from a ship's "bilge water, . . . fuel tank cleaning wastewater, ballast tank wastewater, compensating tank wastewater, bulk fuel tank bottom wastewaters, hydro-blasting wastewater and wastewater contaminated with Aqueous Film Forming Foam and Fuel System Icing Inhibitor." *Id*., pg. 4. It also refers to "any fuel produced from used oil by processing, blending or other treatment and also include[s] any oil or waste petroleum . . . or Petroleum Oil and Lubricant product that has been refined from crude oil or is synthetic oil." *Id*.

15.     The definition of disposal specifies the government is referring to "methods of treatment and/or containment technologies which effectively mitigate the hazards to human health or the environment when hazardous waste is discharged, deposited, injected, dumped, spilled, leaked or placed into the land, air, or water." *Id*.

16.     The Solicitation explains that it is a "Requirements contract", meaning that the contractor is obligated to fill all the task orders placed within the contract period for six different "requiring activities": 1) "Ship Repair Facility-Japan Regional Maintenance Center Detachment (SRF-JRMC Detachment) Sasebo" 2) "Military Sealift Command visiting ships" 3) "Commander Fleet Activities Sasebo Port Operations" 4) "Naval Facilities Engineering Command Far East, Sasebo" 5) "Naval Beach Unit 7 Sasebo" 6) "NAVSUP Fleet Logistics Center Yokosuka, Fuels Department, Sasebo". *Id*.

17.     The minimum equipment required for the contract was provided by the government in the chart below:

| CLIN | Minimum Quantity | Other Requirement |
|------|------------------|-------------------|
| Treatment Barge | 1 | 200,000 gallons holding capability and capability to treat 15,000 per hour |
| Collection Barge | 3 | 50,000 gallons holding capability |
| Vacuum Truck | 1 | 2,400 gallons holding capability |

*Id.*, pg. 29.

18.     The scope of work section states that the awardee will "[p]rovide all necessary personnel, applicable subcontractors, labor, analysis, transportation, packaging, equipment, compilation and submission of required documentations, inspecting, marking, labeling, loading, unloading, removing and transferring/disposing/treating/recycling of OWW." *Id.*, pg. 5. It further requires the awardee to pay any "fees, charges, taxes and customs duties associated with the recycling of the treated waste oil"; "[p]ay transportation, collection and holding cost for disposition of treated waste oil."; and "[p]ay disposal cost of non-regulated waste sludge and filters (industrial waste) generated from treatment operations." *Id.* A more detailed explanation of the scope of work follows in section five of the solicitation. *Id.*, pgs. 5-7.

19.     Although stating that the Solicitation would be based on "FAR Subpart 13.2" (i.e. "Actions At or Below the Micro-Purchase Threshold"), the Solicitation references the title of FAR § 13.5, "Simplified Procedures for Certain Commercial Items." *Id.*, pg. 18. The award was ultimately for $340,972.70—well above the threshold of a micro-purchase. Exhibit A.  The Solicitation further advised that the award would go to "the responsible offer who submits the lowest priced, technically acceptable offer with an acceptable level of past performance risk." Solicitation, pg. 29 (citing FAR § 52.212-2).

20.     The Solicitation also advised that any pursuant contract "incorporates performance standards that establish the performance level required by the government to meet the contract requirements. The standards are measurable and structured to permit an assessment of the contractor's performance." *Id.*, pg. 3. A quality assurance surveillance

plan ("QASP") is further detailed in the Solicitation, requiring quarterly evaluations to be performed by the government. *Id.*, pgs. 13-14.

21.    The objectives of the QASP include inspections to confirm the awardee is "[c]omply[ing] with all environmental protection requirements" and that the awardee will "[s]ample, test, profile, transport, and dispose of industrial and hazardous waste properly." *Id*. The performance standard for these QASP criteria is "100% of the time" and "[n]o deviation is permitted." *Id*.

22.    Regarding the evaluation of proposals, the Solicitation is clear that it is a "Lowest Price Technically Acceptable (LPTA)" evaluation. *Id.*, pg. 29. In other words, "[t]he government will award to the lowest priced offeror that is rated technically acceptable and that is also rated as having acceptable past performance." *Id*. Per the Solicitation, past performance would only be rated as either acceptable or unacceptable. *Id.*, pg. 30.

23.    Those terms are further defined in the Solicitation: "An 'Acceptable' rating will be given to an offeror who within the past three years has been not seriously deficient in contract performance, or in the event of a seriously deficient rating the [CO] determines that the circumstances were properly beyond the offeror's control or that the offeror took appropriate corrective action . . . . An 'Unacceptable' rating will be given to an offeror who within the past three years has been seriously deficient in contract performance, unless the [CO] determines that the circumstances were properly beyond the offeror's control or that the offeror took appropriate corrective action. 'Seriously deficient' denotes a situation where performance did not meet a material contract requirement. The past performance summary report will also include the recommendations and /or questions for each offeror's proposal if

8

there remains a need for discussions. An offeror who receives a rating of Unacceptable will not be further considered for award and will be excluded from the competitive range." *Id.*

24.     The past performance information ("PPI") is to be based, in part, on similar services provided by the contractor to any governmental agencies or the private sector within the past three years. The Solicitation states that the "Government will also review other data base [sic] such as Past Performance Information Retrieval System (PPIRS) and Contractor Performance Assessment Reporting System (CPARS) for relevant past performance." *Id.*, pg. 29.

25.     Another part of the PPI evaluation requires an assessment of the contractor's prior work in these three areas: "[1] Quality of service (technical compliance with contract requirements) [2] Timeliness of performance (ability to meet schedule); and [3] Management (offeror's general businesslike concern for the interest of the customer." *Id.*, pg. 30.

**A.  Safety and Environmental Requirements**

26.     The Solicitation provides detailed safety and environmental requirements. *Id.*, pgs. 7-11. Generally, the safety section requires that the contractor "take proper safety and health precautions to protect the workers, public, property of others and the environment, IAW [in accordance with] Occupational Safety and Health Administration (OSHA), Japanese, Navy, Federal, State and local laws and regulations." *Id.*, pg. 7.

27.     More specifically, the contractor is "responsible for identifying and complying with all safety requirements set forth in applicable safety and health regulations and/or base installation safety procedures" and "responsible for ensuring that his agents, employees, or

9

subcontractors perform the work in a safe manner . . . ." *Id*. Furthermore, the contractor is required to "ensure that all personnel involved in the handling and transportation of the material . . . are trained in the area of spill response . . ." and to "maintain standards designed to minimize the possibility of fire, explosion, or any unplanned release or migration of hazardous waste or its constituents to the air, soil, surface or groundwater". *Id*.

28.    Under section seven, regarding environmental requirements, the Solicitation reiterates that the "contractor shall comply with all applicable Japanese laws and regulations . . . ." *Id*., pg. 8. This section also requires the contractor to perform its work consistent the policy and goals of the "Environmental Management System (EMS) program". *Id*. One of the goals of the EMS program is to "[p]revent pollution at the source." *Id*. The corresponding policy is that the contractor should "[p]rotect public health and the environment by being an environmentally responsible member of Sasebo's community." *Id*.

29.    To that end, and highly relevant to potential risks of the award, the environmental section in the PSW also requires the contractor to sample and test any waste streams or effluent discharge from its treatment barge. *Id*., pg. 9. The laboratory must be accredited and the contractor is also required to forward copies of the test results to "NAVFAC FE PWD Environmental Division, Wastewater Program Manager and SRF Environmental within five (5) working days of receiving results." *Id*., pgs. 9-10.

30.    As part of the goal of preventing pollution, one of the environmental subsections states that: "Prior to the start of any OWW transfer action, the contractor shall ensure a spill boom is completely installed around the contractor barges ensuring proper containment with no gaps or spaces. The contractor shall have spill response equipment staged and ready for use for shore-based operations prior to the start of any OWW transfer action." *Id*., pg. 10.

10

31. This requirement is further reinforced by the next subsection stating unequivocally that "[a]ll spills and releases caused during the performance of work is the contractor's responsibility and liability." *Id*. The contractor is required to have resources prepared to "prevent, contain, and clean up all spills on the Government property" and to report "ANY spill or release regardless of source immediately upon detection . . . ." *Id*. (emphasis in original).

**B. Responsibility Certification Requirements**

32. The Solicitation incorporated FAR § 52.209-5, requiring the offeror to make a certification regarding responsibility matters. *Id*., pg. 25. The certification first requires an offeror to certify it is not "presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency". *Id*. The next paragraph requires the offeror to confirm that it has not, within the last three years, been convicted or had a civil judgment rendered against it for, "falsification or destruction of records, making false statements" as well as some other specified crimes. *Id*.

33. Then, the offeror must certify that is not "presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of" any of the crimes specified in the prior paragraph. *Id*. The rest of the certification focuses on any tax delinquencies or similar issues the offeror might have. *Id*., pgs. 25-26.

34. At the very end of the provision, the regulation explains that the certification "is a material representation of fact upon which reliance was placed when making award." *Id*. If the certification is later determined to be incorrect, and the offeror knowingly rendered it regardless, the CO may terminate the contract for default, among "other remedies available to the Government . . . ." *Id*., pg. 26.

35. The Solicitation also incorporates another similar regulation, FAR § 52.209-7.

This one applies to contractors with over $10 million in total value of federal contracts and grants. *Id*., pg. 27. If so, the offeror is certifying that its Federal Awardee Performance and Integrity Information System ("FAPIIS") is "current, accurate, and complete as of the date of submission of this offer" regarding any criminal convictions, findings of fault and liability that resulted in a significant monetary fine or penalty, or any consent decrees with an acknowledgement of fault (if the proceeding could have led to a significant fine or penalty). *Id*.

36.     Another incorporated regulation, FAR § 52.209-9, requires the contractor to regularly update the FAPIIS system, "throughout the life of the contract," and describes a procedure by which the contractor can protest any information on FAPIIS becoming public and add comments regarding any of that information. *Id*., pg. 28.

**C. Procedural Background**

37.     After being notified that it was not the successful offeror, Seaon filed a timely agency protest. The primary reason for the agency protest was the failure to consider the ongoing investigations of the Awardee (into falsification of test samples and illegal dumping) that directly related to type of work contemplated by this Solicitation. Solicitation, pg. 3; Exhibit B. The agency protest also noted that Kanto likely failed to disclose these ongoing investigations to the CO, which amounts to a false certification. Per the media reports (which the Agency has never denied), Awardee is being investigated by the Department of Justice, the Navy, the Federal Bureau of Investigation, and Japanese authorities for pumping untreated wastewater into Japanese ports and submitting false test samples to cover it up since 2008. Exhibit B, pgs. 1-2; Exhibit D; Exhibit E.

38.     These investigations were begun based on reports from several whistleblowers that were employees of the awardee. *Id*., pg. 2. American sailors also reported seeing spills from

12

Kanto's ships while they were removing OWW. *Id*., pg. 3. One Navy employee stated that he had flagged Kanto's wrongdoings "to superiors about 10 times over several years." *Id*., pg. 2.

39.    The agency denied the protest and admitted that although the CO "was aware of prior media reports indicating that Kanto Kosan had allegedly committed violations of contracts and law", because there were not any "formal findings or proceedings" against Kanto and the recent past performance information reviewed by the CO indicated their performance was satisfactory, the CO was justified in determining Kanto was a responsible contractor. Exhibit C, pgs. 3, 6. The agency also stated that "the Navy is unable to comment on ongoing criminal investigations". *Id*., pg. 3.

40.    The agency has admitted that there is an ongoing investigation for the reasons stated, and openly indicates that nothing to do with the investigation was considered when assessment whether Kanto has a satisfactory record of business ethics. Exhibit C, pgs. 3-4.

### VII.    <u>CLAIMS FOR RELIEF</u>

**A.  The CO Failed to Reasonably Inquire, Consider and Investigate Whether Kanto Has a Satisfactory Record of Integrity and Business Ethics, as Required by 48 C.F.R. §§ 9.103-9.104.**

41.    48 C.F.R. § 9.103(a) states that "contracts shall be awarded to, responsible prospective contractors only." The statute goes on to further state explain that the "award of a contract to a supplier based on lowest evaluated price alone can be false economy if there is subsequent default . . . or other unsatisfactory performance resulting in additional contractual or administrative costs. While it is important that Government purchases be made at the lowest price, this does not require an award to a supplier solely because that supplier submits the lowest offer. A prospective contractor must affirmatively demonstrate its responsibility,

13

including, when necessary, the responsibility of its proposed subcontractors." 48 C.F.R. §

9.103(c).

42.     By failing to properly inquire to even see if any information regarding the US.

Government investigation could impact Kanto's record of business ethics, and consider facts that

are highly relevant to Awardee's responsibility determination and the seriousness of those facts,

the agency failed to consider and comply with the 48 C.F.R. § 9.104-1(d) by finding Awardee to

be responsible. Furthermore, due to the CO's conclusory determination that Awardee was

responsible and that there was no need to inquire further, the CO failed to look into the debarment

regulations for guidance related to business ethics and integrity. *See* Trilon Educ. Corp. v. United

States, 578 F.2d 1356, 1360 (Ct. Cl. 1978) (finding that the CO should have considered the

debarment regulations in his determination of responsibility).

43.     "According to the debarment regulations, 'the fraudulent, criminal, or **other**

**seriously improper conduct** of any officer, director, shareholder, partner, employee, or other

individual associated with a contractor *may* be imputed to the contractor when the conduct

occurred in connection with the individual performance of duties for or on behalf of the

contractor, or with the contractor's knowledge, approval, or acquiescence.'" Impresa Construzioni

Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1335 (Fed. Cir. 2001) (quoting 48

C.F.R. § 9.406-5(a)) (emphasis added). The agency failed to conduct any assessment under the

debarment regulations to even consider whether Kanto's conduct may be imputed to its record for

this procurement award. The agency also failed to determine whether Kanto failed to make a

mandatory disclosure by not disclosing credible facts pointing to its own misconduct that the U.S.

Government is currently investigating. The agency also failed to determine whether Kanto had

'effective standards of conduct and internal control systems in place at the time of the activity

14

which' the U.S. Government is currently investigating. FAR 9.406-1. Such an omission falls short of the regulatory requirements.

44.     A company facing debarment does not amount to a criminal conviction or civil charge but instead is a process that may lead to an adverse result. The fact that the Awardee is under federal government investigation by the Navy for illegal dumping and falsification of testing samples is serious enough that it should have been considered by the CO in determining whether the Awardee had a satisfactory record of business ethics. Exhibit B. Here, an investigation could also very well lead to an adverse result. However, the CO made no such inquiry or consideration whatsoever. Therefore, since the Agency did not inquire into the status of this investigation, or consider any facts therein, it failed to make a proper responsibility determination which ultimately lead to Kanto's award.

45.     The Contracting Officer admitted only reviewing Kanto's responses to the Responsibility Determination Questionnaire and Awardee's recent past performance documents to determine that Kanto has a satisfactory record of integrity and business ethics. Exhibit C, pg. 4. The CO made it clear that she just relied on Kanto's past performance record and the fact that there were not yet any current indictments or convictions to determine that the Awardee was a responsible contractor. *Id*., pgs. 3-4. Given the highly relevant statement of work that in this case, the CO's failure to even consider the information was arbitrary and capricious.

46.     The Agency record suggests that the Agency did not consider the debarment regulations for any further guidance but instead made a conclusory decision and took a hands-off and mechanical approach simply because—despite an ongoing federal investigation—there was no formal indictment or charge. *Id*. While the Navy may have a policy against commenting to the public regarding ongoing investigations, which the agency correctly notes, that does not justify the

CO's failure to seek such information from other members of its own agency. *Id.*, pg. 3. This failure to inquire, and to see if there was any information or considerations that can impact Kanto's record on business ethics and integrity, resulting in the likely waste of tax-payer dollars in this procurement process, fits the definition of arbitrary and capricious action. 5 U.S.C. § 706(2)(A) (requiring a court to set aside an agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.").

47.     In short, the agency has failed to provide a "coherent and reasonable explanation" under the unique and highly relevant facts presented in this case. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009) (quoting Impresa, *supra*, 238 F.3d at 1332).

**B. The CO Failed to Sufficiently Document the Record To Support Her Decision.**

48.     It is undisputed, and even admitted by the Defendant, that the contracting agency was aware, from prior media reports, of the federal government's investigation and the allegations that Kanto was illegally dumping OWW and falsifying test samples. Exhibit C, pg. 3. This raises an obvious dilemma for the Agency: did the CO know the Awardee was under investigation and simply ignored the fact that Kanto failed to disclose that in their proposal? Or was the CO actually unaware of the ongoing investigations, and that's why she failed to inquire into their status when Kanto failed to disclose them? Either way, this further demonstrates the arbitrary, capricious nature of the evaluation and the failure of the CO to properly document her evaluation. The CO has made a flat out conclusion, without consideration of FAR § 9.104-1(d) and 48 C.F.R. § 9.103 for further guidance and consideration, that Kanto possessed a positive record of business integrity and ethics.

49.     The failure of Kanto to report the actual investigation was "too close at hand" to this underlying statement of work. BillSmart Solutions, LLC, B-413272.4, B-413272.5, 2017

Comp. Gen. Proc. Dec. P 325 at 8 (Oct 2017). The agency took a hands-off approach to such

serious information and essentially turned a blind eye to the impact of such information and

whether it should even impact its affirmative determination of Kanto's responsibility. Exhibit C,

pg. 4. Protestor specifically highlights that it is the CO's failure to even consider the applicable

regulations to even see if there can be any impact to Kanto's record creates the unreasonableness

that ultimately led to a flawed result.

50.     This Solicitation called for certifications and representations regarding the

awardee's records for integrity and business ethics. It is undisputed that Kanto knew of the

investigation into its alleged actions and that Kanto never disclosed such information to the Navy.

This concealment alone contradicts the CO's determination that Kanto has a satisfactory record of

integrity and business ethics, and there is nothing in the record indicating that the CO considered

this concealment. Exhibit C. Therefore, even if the CO did consider these issues, the record was

insufficiently documented, as required by FAR § 15.308.

**C. Because the Awardee Had an Implied Obligation of Disclosure, Imposed by General**
   **Principles of Integrity and Ethics, Under FAR § 9.104-1 and FAR § 9.406-2, and Failed**
   **to Report an Ongoing Investigation That is Relevant to the Solicitation, Its Proposal Was**
   **Tainted With a Material Misrepresentation, Concealment and a False Certification to**
   **the United States. The CO's Award Cannot be Premised on Such an Action by Kanto.**

51.     The Court has held there is an "implied obligation of disclosure, imposed by

general principles of integrity and business ethics. See FAR § 9.104-1(d)." Thoma-Sea Marine

Constructors, LLC v. United States, 141 Fed. Cl. 185, 217 (2018). "Because the FAR provides

little guidance on those principles, the Federal Circuit has suggested looking to 'the . . . extensive

debarment regulations for guidance.' Impresa Construzioni, 238 F.3d at 1335. Causes for

debarment include . . . 'any other cause of so serious or compelling a nature.' FAR § 9.406-2."

Thoma-Sea Marine Constructors, LLC, 141 Fed. Cl. at 217-218. It is self-evident that an

investigation into fraud and violations of environmental law regarding the same type of contract

would be a "serious or compelling" cause, requiring disclosure in a subsequent Solicitation. Kanto

clearly should have disclosed this investigation and its response to the same, but instead concealed

this information. Even if Kanto is ultimately cleared of the allegations, its failure to mention the

investigation means that it violated the "implied obligation of disclosure, imposed by general

principles of integrity and business ethics." Thoma-Sea Marine Constructors, LLC, supra.

    52.    The CO's award decision is arbitrary in that it should not be premised on

intentional misrepresentation and failure to disclose a material matter of serious importance by

Kanto. The Awardee was well aware that it was being investigated by several United States

federal authorities (i.e. the Department of Justice, the Navy, and the Defense Criminal

Investigative Services) as well as Japanese authorities for its illegal dumping and testing

falsification. Despite this knowledge, Kanto affirmatively chose to not disclose these ongoing

investigations to the U.S. government. By failing to properly disclose and inform the government

via its certification, awardee demonstrated a lack of integrity and business ethics as required by

the regulations. FAR § 9.104-1(d). The CO's final award cannot be justified.

    53.    There can also be no dispute that Kanto failed to list any information about its

investigations or integrity violations in the certifications required for SAM (System of Award

Management) and FAPIIS. Solicitation, pg.  28. The CO materially relied on statements or, in this

case, omissions to form her opinion as to whether awardee met the business ethics and

responsibility determinations. This analysis is supported by the Agency's statement in the Agency

response that "evaluation of [Kanto's] past performance included evaluation of both information

provided by the offeror and evaluation of data found in other databases, including CPARS and PPIRS . . . ." Exhibit C, pg. 4.

54.    "As material, intentional misrepresentations taint the award process, 'prevent government officials from determining the best value to the government and retard the competitive bidding process,' an offeror who is found to have made such a misrepresentation 'will lose its right to execute the solicited work or bid on the reprocurement of the contract.'" Algese 2 s.c.a.r.l. v. United States, 125 Fed. Cl. 431, 440 (2016) (quoting Microdyne Outsourcing, Inc. v. United States, 72 Fed. Cl. 230, 233 (2006); *see also* Northrop Grumman Corp. v. United States, 50 Fed. Cl. 443, 468 (2001). The CO incorrectly found that Kanto was a responsible contractor as required by FAR § 9.104-1. Due to Kanto's intentional misrepresentation, they should lose the right to execute the solicited work.

**D.  The CO Failed to Reasonably Consider and Inquire into Information That, by Its Nature, Would be Expected to Have a Strong Bearing on Whether the Awardee Should be Found Responsible**

55.    The agency concluded that, based on the representations submitted by Kanto and the past performance information received, Kanto is a responsible contractor and therefore determined that no further inquiry was required. Exhibit C, pg. 4. This requires an assumption that all the information provided by Kanto was complete and accurate, which as explained above, is inconsistent with the CO's statement that she became aware of the investigation from prior media reports. *Id*.

56.    The Agency's approach and ultimate finding that Kanto is a responsible contractor, and the corresponding determination that it has a satisfactory record of "integrity and business ethics" is flawed and not supported by the record because in reviewing whether a contract has met

the "integrity and business ethics" requirement, the CO should have reviewed the more extensive

debarment regulations for guidance. Algese 2 s.c.a.r.l. at 441 (quoting Impresa, 238 F.3d at 1335

(citing Steptoe & Johnson, Comp. Gen. Dec. B-166118, 1969 U.S. Comp. Gen. LEXIS 2852,

1969 WL 4287, at *5 (Mar. 28, 1969); Secretary of the Army, 39 Comp. Gen. 868, 872, 1960 WL

1741 (1960))).

57.     Per FAR § 9.406-2(c), those regulations include as a reason for debarment "any

other cause of so serious or compelling a nature that it affects the present responsibility of the

contractor or subcontractor." Similarly, the Court of Federal Claims has previously held that

"[w]hen assessing a prospective contractor's record for integrity and business ethics under FAR

Part 9, the contracting officer is considering the reputational and performance risks the offeror

may pose." Algese 2 s.c.a.r.l., 125 Fed. Cl. at 442. This was not done here.

58.     The agency itself acknowledged that it did not at all consider the ongoing

investigation into Kanto's alleged illegal dumping of OWW and falsification of records. Exhibit

C, pg. 4. It is self-evident that, given the potential health, safety, environmental, and political (i.e.

damaging U.S.-Japanese relations) concerns with the alleged actions by awardee, the government

should have at the very least inquired into the status of these investigations. Given that the CO

was aware of these investigations but chose not to consider whether these investigations, or their

likely imminent conclusion, add any potential for risk in reputation or performance warrants a

finding of unreasonableness.

**E.  The CO Failed to Follow Procurement Law and Therefore the Evaluation and Award
     Were Arbitrary, Capricious, and an Abuse of Discretion.**

59.     "[T]he determination that an offeror is capable of performing a contract is largely

committed to the contracting officer's discretion, [and the GAO] will generally not consider a

protest challenging an affirmative determination of responsibility except under limited, specified exceptions. 4 C.F.R. § 21.5(c) (2003); Verestar Gov't Servs. Group, B-291854, B-291854.2, Apr. 3, 2003, 2003 CPD ¶ 68 at 3. One specific exception provided in the revised Bid Protest Regulations is that our Office will consider a protest that identifies serious concerns that a contracting officer[,] in making an affirmative determination of responsibility[,] failed to consider available relevant information or otherwise violated statute or regulation. 4 C.F.R. § 21.5(c). As explained in the preamble to our revised regulations, the revision to our regulations was intended to encompass protests, where, for example, the protest includes specific evidence that the contracting officer may have ignored information that, by its nature, would be expected to have a strong bearing on whether the awardee should be found responsible. 67 Fed. Reg. 79,833-834 (2002)." Matter of Southwestern Bell Telephone Co., B-292476 (Oct. 2003).

60.     In this case, Seaon has provided extensive, specific evidence of alleged criminal behavior by the Awardee, that the United States arguably possessed sufficient information to move forward with an official investigation, and the agency admitted that it ignored the information simply because it had not yet resulted in the filing of any criminal or civil indictments. Exhibit B; Exhibit C, pg. 4; Exhibit D; Exhibit E. This is especially troubling wherein the agency also acknowledged that an affiliate of the awardee had its license suspended for violating environmental regulations, but simply claimed it was too remote in time to be considered. Exhibit C, pg. 4.

61.     All of this information self-evidently has a "strong bearing" on whether the awardee should be found responsible, because the prior license suspension and current allegations are for violations of environmental law and falsification of test records for doing the same type of work that is contemplated by this Solicitation, the treatment and disposal of OWW. Solicitation,

pg. 3; Exhibit C, pg. 4. Furthermore, whether it's been convicted of falsifying records in relation

to a government contract is one of the items Kanto was specifically required to certify by the

Solicitation, and that certification was materially relied upon by the CO in making her

responsibility determination. Solicitation, pg. 25.

62.     At the very least, the contracting officer should have asked the awardee about the

investigations and its response. Matter of FN Manufacturing, Inc., B-297172; B-297172.2 (Dec.

2005) (denying protestor's challenge to CO's affirmative determination of responsibility because

the contracting officer investigated open fraud investigation and did not ignore the matter).

63.     The CO's failure to even inquire into the investigations of Kanto for falsifying test

samples for over ten years is an abuse of discretion as it applies to the level of inquiry needed in

this case, and the agency is unable to provide any "coherent or reasonable explanation" for that

failure. Exhibit C, pgs. 3-4; Axiom Res. Mgmt., Inc., 564 F.3d at 1381 (Fed. Cir. 2009) (quoting

Impresa, 238 F.3d at 1333).

**F.  The Agency Conducted a Flawed Past Performance Evaluation and Ultimate Award,**
     **Despite its Awareness of the Potential Serious Health and Safety Issues and Alleged**
     **Wasting of Taxpayer Dollars.**

64.     The Agency has argued that the CO performed the past performance evaluation in

accordance with the stated evaluation criteria included in the solicitation. Exhibit C, pg. 4. The

information it ignored, however, was more than just "too close at hand"; rather, the very nature of

the federal government's investigation has a direct impact on the very PWS for this contract.

Exhibit B; Solicitation, pg. 3; BillSmart Solutions, LLC, *supra*. The Agency has argued that the

evaluation of Kanto's past performance included evaluation of both information provided by the

offeror and evaluation of data found in other databases, including CPARS and PPIRS, as was

described in the RFQ. Exhibit C, pg. 4. Based on this information, Kanto's past performance record was found to be acceptable. *Id.*

65.    As admitted by the agency throughout, no inquiry was made to any source of information outside the official databases when there was clear access to investigative information for the limited purpose of making a responsibility determination. Although the Navy may not be able to comment on ongoing investigations to the public, as the agency has claimed, there is clearly nothing that would prevent internal, confidential communications for the limited purpose of making a responsibility determination. Exhibit C., pg. 3. In fact, the court has previously supported a CO's nonresponsibility determination when the CO relied upon an investigative report (which did not rise to level of a criminal charge, indictment, nor civil penalty). Here, had the CO even considered the pertinent facts, it could very well have found that Kanto's past performance could be impacted. Again, no such inquiry was conducted.

66.    In Ettefaq-Meliat-Hai-Afghan Consulting, Inc. v. United States, 106 Fed. Cl. 429, 437 (2012), the Court held that "information in investigative reports may be used as the basis of a nonresponsibility determination" (citing In re Frank Cain & Sons, Inc., B-236893, 1990 U.S. Comp. Gen. LEXIS 45, 1990 WL 277550, at *2 (Comp. Gen. 1990)). In the Ettefaq case, the CO relied on a report prepared by military intelligence unit to find that the protestor had a lack of "integrity and business ethics" sufficient to find that the protestor was not a responsible offeror. Ettefaq-Meliat-Hai-Afghan Consulting, Inc., 106 Fed. Cl. at 436.

67.    Even though it was not a criminal charge or indictment, the CO's reliance on this investigative report was found to be reasonable. This strongly undercuts the Navy's argument that none of the allegations could be considered at all simply because there were not yet any criminal charges or formal, public findings. The public would not have had access to the military

intelligence unit's investigative report in the <u>Ettefaq</u> case, yet the CO was allowed to rely upon the same. Here, the very nature of the work in this contract, and potential risk would seem to create a higher standard for the CO to inquire.

68.     "[T]he [CO]'s general recognition that there were allegations of misconduct concerning [awardee] is not alone sufficient to establish that the contracting officer reasonably assessed the awardee's record of integrity and business ethics." <u>Matter of Southwestern Bell Telephone Co.</u>, *supra*, pg. 9. Similarly, in this case, the CO's admission that she was aware of the allegations is not sufficient to establish that she reasonably assessed the awardee's record of integrity and business ethics. Exhibit C, pgs. 3-4.

69.     In <u>Matter of FCi Federal, Inc.</u>, B-408558.4; B-408558.5; B-408558.6, p. 8 (Oct. 2014), the GAO sustained a protest of a CO's affirmative responsibility determination wherein the contracting officer, although being aware of DOJ allegations due to media reports, "did not read DOJ's civil complaint for details regarding the allegations; she received no information from [the awardee or its parent company] regarding the alleged fraud; she did not discuss the allegations with anyone at OPM [Office of Personnel Management]; she did not seek information from the suspension and debarment officials of OPM or DHS; and she did not contact anyone at DOJ to obtain additional information about the allegations." Because of this lack of inquiry on the part of the contracting officer, the GAO found that "she lacked the facts necessary to make an informed decision about, and thus failed to adequately consider, the [DOJ] allegations . . . ." Id. at 7.

70.     Similarly, in this case, the record is clear that the CO failed to take any of the investigative actions recommended by the GAO in <u>Matter of FCi Federal, Inc.</u>, *supra*. Exhibit C. Therefore, she was unable to adequately consider the potential effect those allegations would have on her responsibility determination. This is further evidence that the evaluation and award were

arbitrary and capricious.

71.     The Agency's flawed assessment is summed up by the fact that the very crimes Kanto is currently being investigated for involve essentially identical government contracts, and not simply other third party contractors, to the one Kanto was just awarded. Given the obvious relevance of these investigations, it is self-evident that at least some inquiry should have been made into their status.

**G.  The Agency's Failure to Properly Investigate Whether Kanto is a Responsible Contractor, and Its Failure to Properly Review Past Performance Information, Provided an Unfair Advantage to Kanto, Thereby Violating the Competition in Contracting Act.**

72.     Per 41 U.S.C. § 3301 *et seq*. and the terms of the Solicitation, the Agency is required to provide all offerors a "full and open competition." Solicitation, pg. 3. Based on the allegations being made, by both American sailors and former employees of Kanto, Kanto would be obtaining a clearly unfair economic advantage by fraudulently dumping untreated OWW and falsifying test samples. Exhibit B. Kanto may be able to submit a lower priced proposal simply because it is not actually treating the OWW or consistently performing the contracts it is awarded. No reason was provided for Kanto receiving the award other than their lower price. Exhibit A.

73.     The agency's failure to even inquire into the status of the investigation, or Kanto's response thus far, demonstrates that the agency failed to make an accurate responsibility determination. This failure, aside from being contrary to procurement law as explained above, also violates the Competition in Contracting Act, specifically 41 U.S.C. § 3301(a)(1) as it contravenes the sections of the FAR cited above (i.e. FAR §§ 9.104-1, 9.406-2).

74.     These violations of FAR and the agency's procurement process, denied Seaon an opportunity to fairly compete for the Solicitation and arguably penalized Seaon for having

integrity and business ethics.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks this Court to enter judgment in its favor and against Defendant and to:

(1) grant a Temporary Restraining Order and preliminary injunction enjoining the Navy and therefore stopping all procurement actions regarding the Solicitation;

(2) direct the Navy to re-evaluate Kanto's responsibility, including an inquiry into the ongoing investigations being conducted by the Navy and Kanto's response thereto;

(3) award to Seaon attorney fees and costs in pursuing this action, and/or its proposal costs;

(4) grant a protective order to Seaon given the sensitive and proprietary information in this case; and

(5) grant any other such relief as the Court deems appropriate and just.

Respectfully submitted,

_s/Theodore P. Watson_
Theodore Watson, Esq
Watson & Associates LLC
Colorado Bar No.: 34908
10200 East Girard Ave, Suite C245/ C250
Denver, Colorado 80015
(720) 941-7200 Office
(720) 941-7201 Fax
watsont@theodorewatson.com
Attorney of Record
Counsel for Seaon Environmental, LLC

_s/Wojciech Z. Kornacki_
Wojciech Z. Kornacki, Esq.
Watson & Associates, LLC, _Of Counsel_
1629 K Street N.W., Suite 300

Washington, D.C. 20006
Telephone: 202-827-9750
Fax: 1-866-855-1040
kornackiw@theodorewatson.com
Counsel for Seaon Environmental, LLC

Dated: September 15, 2020

**TABLE OF EXHIBITS**

| Exhibit | Description |
|---------|-------------|
| A | Unsuccessful Offer Notification, August 14, 2020 |
| B | Wall Street Journal Article, December 1, 2019 |
| C | Agency Protest Response, August 28, 2020 |
| D | Constantine Cannon Article, December 6, 2019 |
| E | Maritime Executive Article, December 3, 2019 |

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of September 2020, a copy of the foregoing Complaint was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

*s/Wojciech Z. Kornacki*
Wojciech Z. Kornacki, Esq.
Watson & Associates, LLC, *Of Counsel*
kornackiw@theodorewatson.com

Date Filed: September 15, 2020